# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MALCOM P. COLEMAN, | CV F  03-5780 DLB HC |
| Petitioner, | ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND DIRECTING CLERK OF COURT TO ENTER JUDGMENT IN FAVOR OF RESPONDENT |
| v. | |
| DIANA BUTLER, Warden, | [Doc. 14] |
| Respondents. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.

## PROCEDURAL HISTORY

On January 12, 1999, Petitioner was convicted in the Kern County Superior Court for two counts of rape, one count of oral copulation, and one count of kidnaping.  On February 10, 1999, Petitioner was sentenced to life in prison with no parole eligibility for 25 years.

Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth Appellate District.  On January 22, 2001, the Court of Appeal affirmed the judgment and sentence.  (Respondent's Exhibit D, attached to Answer.)

Petitioner filed a petition for review with the California Supreme Court.  On March 28, 2001, the petition was denied.  (Respondent's Exhibit F.)

On November 20, 2000, Petitioner filed a petition for writ of habeas corpus in the Kern

County Superior Court.  The petition was denied on December 14, 2000.  (Respondent's Exhibit H.)

On April 4, 2002, Petitioner filed a second petition for writ of habeas corpus in the Kern County Superior Court, and that petition was denied on April 30, 2002.  (Respondent's Exhibits I, J.)

On May 9, 2002, Petitioner filed a petition for writ of habeas corpus in the Fifth District Court of Appeal.  That petition was denied on August 27, 2002.  (Respondent's Exhibits K, N.)

On September 10, 2002, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  On May 14, 2003, the petition was denied.  (Respondent's Exhibit O, P.)

Petitioner filed the instant federal petition for writ of habeas corpus on May 28, 2003. Pursuant to the Court's order of August 19, 2003, Petitioner filed an amended petition on September 26, 2003.

Respondent filed an answer on January 7, 2004, and Petitioner filed a traverse on May 6, 2004.

<u>STATEMENT OF FACTS</u>

Lisa A., the victim, and Petitioner had known each other for approximately five or six years.  They began dating on May 18, 1998 and began living together shortly thereafter.  (RT 155-157.)  Petitioner moved in with Lisa's mother, and her three children.  (RT 157.)  Lisa and her children subsequently moved into her sister's home and Petitioner followed two or three weeks later.  (RT 160.)

On October 10, 1998, at approximately 11:30 p.m., Lisa A. left the convalescent hospital where she worked to home.  As she was walking to her vehicle, Petitioner approached Lisa.  Lisa told him she did not want to talk to him.  (RT 205.)  However, Petitioner pushed her into her vehicle through the driver side door and onto the passenger seat. (RT 206.) Petitioner drove the vehicle out of the parking and stopped to retrieve the bicycle he had ridden there on, and while he was placing it in the trunk, Lisa ran from the vehicle.  (<u>Id</u>.)  Petitioner chased her, pushed her into a fence, struck her on the left side of the head behind her ear and forced her into the vehicle. (RT

1   207-208.)  Petitioner proceeded to drive off screaming at Lisa to shut up as he was going to do all

2   the talking and she was to listen to what he had to say.  (RT 235-236.)  He drove to the apartment

3   the two had previously shared on Chester Lane.  (RT 236.)  During the twenty minute drive to the

4   apartment from the Convalescent Hospital, Petitioner was yelling that she left him, his PG&E

5   was shut off, and he received an eviction notice and all of it was because of her.  (RT 237.)

6   Petitioner told Lisa numerous times that he didn't care if he or she lived or died or whether she

7   saw her children again.  (RT 239.)

8       When the two arrived at the apartment complex, he grabbed Lisa's arm and took her out

9   of the car.  (RT 240.)  The two walked to the apartment, while Petitioner was still holding her by

10  the arm.  (RT 241.)  Petitioner then lead Lisa up the stairs to the bedroom.  (RT 242-243.)  He

11  then immediately told her in a mean voice to "strip buck naked."  (RT 243.)  Lisa out of fear

12  reluctantly complied.  (RT 243.)  Petitioner then took her clothes downstairs, while she sat in the

13  corner of the bedroom.[1]  (RT 244-245.)  When Petitioner returned he had a wooden drum stick

14  that you play an instrument with.  He approached Lisa with it as if he was going to hit her.  (RT

15  246.)  Petitioner stated "I ought to just beat your ass."  (Id.)  Petitioner subsequently threw the

16  stick and instructed Lisa to get on the bed.  (Id.)  He then "crouched over [her], and he placed his

17  hands around [her] neck" and began choking her as she tried to grasp for air.  (RT 248.)  He then

18  told her to put her legs up and he started to perform oral sex on her.  (RT 248-252.)  He then

19  demanded that she perform oral sex on him.  (RT 252-253.)  Lisa gave into his demands as she

20  feared for her safety.  (RT 253.)  Petitioner next ordered her to get on her hands and knees and

21  proceeded to have intercourse with her "doggie" style."  (RT 253.)

22      Petitioner then left the apartment on his bike, Lisa went downstairs (still naked) and

23  attempted to find her car keys and clothing, but she was unable to locate them.  (RT 257.)  She

24  thought about leaving but realized that Petitioner may have been tricking her into thinking that he

25  had left and would cause her further harm if she attempted to leave.  (RT 257-258.)  Petitioner

26  returned approximately six or seven minutes later, with a soft drink for Lisa.  (RT 258.)

27  ─────────────────

28      [1] Lisa had been wearing a blue uniform scrub with a zoo animal print and blue pants.  (RT 244.)

Lisa was able to calm Petitioner down with her assurance that she was ready to move back in with him and restart their relationship.  Petitioner asked her to have sexual intercourse with him again, to which she complied because she felt if she did not he would not let her leave.  (RT 265-266.)  Petitioner obtained Lisa's clothing, however, he instructed Lisa not to put on her uniform shirt as it was torn.  (RT 267.)  He instead gave her one of his T-shirts.  (Id.)  Petitioner kept the torn smock that she had worn to work.  (RT 539-540.)  The smock was later discovered by the police stuffed in the lifting sleeve of a garbage receptacle at Petitioner's apartment complex.  (RT 539-540.)    Both Petitioner and Lisa observed scratches on her neck.  (RT 268.)

Lisa left the apartment at 3:18 a.m. upset and confused, unsure of whether to proceed straight to her sister's house or to the police station.  (RT 269.)  On the way to her sister's house, she saw a police officer and flagged him down telling him what had occurred. (RT 269-270.)  He instructed her to go to the hospital and he followed behind.  (RT 270.)  Lisa was evaluated at the hospital by a nurse and no signs of vaginal tearing, abrasions, bruising or redness were observed.  However, there were scratches on her neck.  (RT 417.)

During the initial confrontation near Lisa's place of employment, she lost an earring and a cross from a necklace, which the police found near where she and Petitioner had struggled in the parking lot.  (RT 402-402.)

Petitioner did not testify at trial, however, a tape recorded statement he gave to police was played for the jury.  (RT 546-548; CT 234-287.)  Petitioner admitted having intercourse with Lisa but claimed it was consensual and that Lisa must be inventing the claimed rape to appease her sister, whom Petitioner claims did not like him.  Petitioner denied any knowledge of how the smock ended up in the garbage receptacle at his apartment complex, claiming Lisa took it with her when she left.  (CT 274.)

<u>DISCUSSION</u>

A.    <u>Jurisdiction</u>

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor,</u>

4

1    529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

2    violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

3    out of the Kern County Superior Court, which is located within the jurisdiction of this Court.  28

4    U.S.C. § 2254(a); 2241(d).

5         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

6    of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

7    enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S.

8    1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting

9    Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

10   1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

11   (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

12   petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

13   B.    Standard of Review

14        This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

15   custody pursuant to the judgment of a State court only on the ground that he is in custody in

16   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

17        The AEDPA altered the standard of review that a federal habeas court must apply with

18   respect to a state prisoner's claim that was adjudicated on the merits in state court.  Williams v.

19   Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

20   will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

21   to, or involved an unreasonable application of, clearly established Federal law, as determined by

22   the Supreme Court of the United States;" or "resulted in a decision that was based on an

23   unreasonable determination of the facts in light of the evidence presented in the State Court

24   proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of

25   the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v.

26   Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

27   because that court concludes in its independent judgment that the relevant state-court decision

28   applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations

1    omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

2          While habeas corpus relief is an important instrument to assure that individuals are

3    constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

4    (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

5    criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

6    Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

7    factual determinations must be presumed correct, and the federal court must accept all factual

8    findings made by the state court unless the petitioner can rebut "the presumption of correctness

9    by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

10   S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

11   110 F.3d 1380, 1388 (9th Cir. 1997).

12   C.    Ineffective Assistance Counsel

13         The law governing ineffective assistance of counsel claims is clearly established for the

14   purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,

15   151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

16   assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

17   668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

18   the petitioner must show that counsel's performance was deficient, requiring a showing that

19   counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

20   the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

21   representation fell below an objective standard of reasonableness, and must identify counsel's

22   alleged acts or omissions that were not the result of reasonable professional judgment

23   considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

24   (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges

25   a strong presumption that counsel's conduct falls within the wide range of reasonable

26   professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

27   Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

28         Second, the petitioner must show that counsel's errors were so egregious as to deprive

6

defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d 1058, 1062 (2000).  With this standard in mind, the Court will now turn to each of Petitioner's claims of ineffective assistance of counsel.

      1.    Failure to Prepare for Trial

Petitioner contends that defense counsel never informed him of any of the evidence the prosecution intended to utilize at trial.  Nor did counsel ever communicate any available defense nor was any presented.  (Amd Petition, at 9-10.)

In his traverse, Petitioner contends that counsel only met with him on two separate occasions and only discussed the aspects of his case at one of the meetings.  Petitioner contends that counsel did not discuss potential evidence that he may have been able to provide, failed to ask Petitioner what evidence to look for at the apartment complex, failed to ask what witnesses to contact, failed to inform Petitioner of the witnesses the prosecution intended to call, and failed to question him regarding any statements obtained through discovery.  Petitioner contends that this deprived him of the ability to assist counsel in the preparation of his defense.

Petitioner's claim is without merit.  As the state court found, Petitioner has failed to show how he was prejudiced from counsel's failure to confer with him or failure to inform him of the

1    evidence to be introduced at trial.  (Respondent's Exhibit J.)  Counsel's declaration indicates that

2    he met with Petitioner on more than one occasion, that he went over Petitioner's case thoroughly

3    with him and that his staff conducted the investigation that Petitioner claims was neglected.

4    (Respondent's Exhibit M.)  Counsel declares that he read police reports and witness statements

5    to Petitioner and informed him of all the evidence the prosecution intended to introduce.  (Id.)

6    Even assuming counsel was deficient in failing to discuss the case further with Petitioner,

7    Petitioner has failed to demonstrate any resulting prejudice.  Petitioner simply has not shown that

8    but for counsel's lack of preparation for trial, there was a reasonable probability that the outcome

9    would be different.  Petitioner's claim therefore fails.

10           2.       Failure to File Pretrial Motions

11          Petitioner contends that counsel failed to file any pretrial motions.  Petitioner's claim

12   fails.  Petitioner fails to specify what motions were neglected.  As Respondent submits, the

13   failure to file unspecified motions is not ineffectiveness.  Kimmelman v. Morris, 477 U.S. 365,

14   384 (1986).  Defense counsel declared that had he seen any meritorious motions, he would have

15   made them.  (Respondent's Exhibit M.)  Petitioner's claim in his traverse that counsel should

16   have filed a motion to exclude the prior acts is without merit.  For the reasons explained below,

17   the prior acts evidence was properly admitted, therefore, any motion made by counsel would

18   have been futile.  James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994); see also Shah v. United States,

19   878 F.2d 1156, 1162 (9th Cir. 1989) ("The failure to raise a meritless legal argument does not

20   constitute ineffective assistance of counsel.") (quotation marks and citation omitted.)

21   Accordingly, Petitioner's claim fails.

22           3.       Failure to Investigate

23          Petitioner contends that counsel "failed to mount a meaningful investigation" and failed

24   to view the crime scenes.  In his declaration, defense counsel declared that an investigation was

25   conducted by his investigator who visited the apartment complex and parking lot where the

26   confrontation began and interviewed all potential witnesses.  (Respondent's Exhibit M.)

27   Petitioner contends that had counsel visited the crime scene, he would have been able to impeach

28   the witnesses testimony regarding their observations.

1    Contrary to Petitioner's contention, defense counsel declares that his investigator visited

2    the apartment complex and the parking lot where the confrontation began and that he interviewed

3    all potential witnesses.  (Respondent's Exhibit M.)

4    In his traverse, Petitioner elaborates at length regarding instances of which he claims

5    counsel should have investigated, including that counsel failed to investigate whether the power

6    was turned off and then on by Lisa, that there was no light in the apartment parking lot to observe

7    any scratches, and that counsel failed to contact any of the neighbors in the apartment complex.

8    Petitioner fails to demonstrate that but for counsel's alleged error in failing to investigate and

9    bring to light certain evidence the outcome would have been different.  This deficiency defeats

10   Petitioner's claim.

11   Petitioner's claim that he informed defense counsel to contact Pamela Mackey who had

12   left a message on Petitioner's machine to establish that Lisa had a motive to fabricate the story

13   regarding the assault.  (Traverse, at 43-44.)  Despite the lack of an affidavit establishing that Ms.

14   Mackey would have testified and what she would have testified to, Petitioner has failed to

15   demonstrate that the failure to call this witness would have resulted in the outcome being

16   different.[2]  Further, Petitioner's defense at trial was that Lisa was making up the story to appease

17   her sister (RT 683), and any evidence tending to demonstrate that Lisa's motive to lie was

18   because of Petitioner's alleged cheating would have been inconsistent with his theory of defense.

19   Further, Petitioner's claim that defense counsel did not view the crime scene in order to

20   examine the witnesses regarding their identity of him as the perpetrator, is without merit.

21   Despite counsel's declaration that his investigator interviewed the crime scene, Petitioner cannot

22   show prejudice by counsel's alleged failure to do so.  Petitioner overlooks the fact that he himself

23   admitted to being at Lisa's place of employment at the time in question.  The audiotaped version

24   of the interview Petitioner gave with police was admitted to the jury.  There Petitioner

25   specifically stated that on the night in question he went to Lisa's place of employment at

26   approximately 11:30 p.m. to give her some of her mail.  (CT 245; RT 546-548.)  Thus, any

27

28        [2]  Further, Petitioner's claim that Lisa was upset because of Ms. Mackey's telephone call to his apartment, was before the jury as it was portrayed to them through his police interview.  (CT 244-245.)

1  challenge to the identity of Petitioner being at Lisa's place of employment on the night in

2  question would have been inconsistent with his version of events portrayed to police.

3      In his traverse, Petitioner contends that counsel failed to interview and call certain family

4  members to testify.  This claim was not raised at the state court below and the Court need not

5  consider such a claim.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994)(noting

6  that a district court need not consider claims raised for the first time in a traverse).  Further, it is

7  unexhausted as it was not raised to the state court.[3]  Even if the Court were to review the claim, it

8  is without merit.  Petitioner submits declarations from three family members including, his

9  mother and two brothers, who declare that they would have testified regarding the relationship

10 between Petitioner and Lisa, and that Lisa was "very jealous, possessive, and controlling

11 throughout their relationship."  (Attachment T to Traverse.)  In his amended petition and

12 traverse, Petitioner merely contends that counsel failed to interview or call his family as

13 witnesses in support of his defense.  This allegation is conclusory and fails to support his

14 allegation that counsel was ineffective or that he was prejudiced as a result.  Petitioner does not

15 demonstrate how this would have furthered his defense or that he was in anyway prejudiced by

16 failing to admit this testimony.  "Conclusory allegations which are not supported by a statement

17 of specific facts do not warrant habeas relief."  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).

18      4.    Failure to Thoroughly Review Documents and Examine Forensic Evidence

19      Petitioner contends that counsel failed to review police reports and examine forensic

20 evidence.

21      In his traverse, Petitioner contends that counsel's failure to thoroughly read, understand

22 and review all related written and documented materials left him unprepared to effectively cross-

23 examine the prosecution's witnesses.  Petitioner contends that this was especially true with

24

25      [3]  A petitioner who is in state custody and wishes to collaterally challenge his conviction by a petition for
writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1).  The exhaustion doctrine is
26 based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged
constitutional deprivations.  Coleman v. Thompson, 501 U.S. 722, 731, 111 S.Ct. 2546, 2554-55 (1991);  Rose v.
27 Lundy, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203 (1982); Buffalo v. Sunn, 854 F.2d 1158, 1163 (9th Cir. 1988).
      A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair
28 opportunity to consider each claim before presenting it to the federal court.  Picard v. Connor, 404 U.S. 270, 276, 92
S.Ct. 509, 512 (1971); Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996)

regard to Lashanda Carter's testimony at the 402 hearing.  Petitioner's claim fails as he has not

demonstrated any resulting prejudice.  That is, Petitioner has failed to demonstrate that but for

counsel's error, Petitioner would have received a different outcome.

    5.    Failure to Research Law

        Petitioner contends that defense counsel failed to adequately research the law with respect

to the admissibility of evidence of prior acts.

        Contrary to Petitioner's contention, defense counsel effectively argued that the evidence

was inadmissible on several grounds.  In any event, the state court of appeal upheld the trial

court's decision to admit the evidence, so Petitioner cannot demonstrate that he was prejudiced

by counsel's alleged failure to more effectively argue the motion.

    6.    Failure to Properly Examine Witnesses

        Petitioner alleges that counsel failed to effectively cross-examine Lisa and impeach her

with statements she made to Detective Tunnicliffe.  Specifically, Petitioner contends that Lisa

gave conflicting statements regarding the taking of a piece of her clothing and whether she was

physically assaulted into complying with Petitioner's sexual demands.  (Amd. Pet. at 14.)

        Petitioner further contends that counsel failed to interview the prosecution's witnesses

and was therefore unable to effectively impeach their testimony.  Petitioner's claim is without

merit, as Petitioner has not demonstrated how any interview of these witnesses would have

resulted in the outcome being different.  Further, counsel declares that he discussed and read all

the witnesses statements and discussed it with Petitioner and listened to his comments and

answered his questions.

        In his traverse, Petitioner claims that counsel failed to interview police officers

Tunnicliffe, Hill, Damo, and O'Nesky; however, even assuming counsel was deficient in failing

to interview these witnesses, Petitioner has not demonstrated any prejudice by counsel's alleged

deficiency.  Accordingly, the claim fails.

        Petitioner claims that counsel failed to improperly impeach Lashanda's testimony at the

402 hearing.  Petitioner claims that the police report of an incident that occurred on December

26, 1997, only indicated a trespassing on Petitioner's part.  However, a review of the 402 hearing

and trial transcripts, reveals that Lashanda testified regarding two incidents of physical violence by Petitioner. The first was on October 7, 1997 incident, in which Petitioner took her into a room, sat on her chest, holding her wrists down, hurting Lashanda. (RT 12-13.) The other incident occurred on an unspecified date (after the October 7, 1997, but before December 26, 1997), in which Petitioner slapped her. (RT 16-20.) Although at the 402 hearing prior to trial, Lashanda initially testified about an alleged act of oral copulation by Petitioner and herself on December 26, 1997, the trial court ruled that evidence inadmissible. (RT 9-10, 52-54.) During trial, Lashanda only testified to the physical confrontation by Petitioner that occurred on October 7, 1997 and the second unspecified incident that occurred after the first incident and before December of 1997. (RT 606-611.) Accordingly, Petitioner's claim that counsel was somehow deficient in failing to seek to impeach or exclude the evidence of an incident that occurred on December 26, 1997, is simply unfounded and misplaced, as that evidence was not admitted or used at trial.

In his traverse, Petitioner attempts to point out inconsistencies in the testimony by Lisa and her coworker Kelly Jones. Even assuming counsel was somehow deficient in failing to point out any alleged inconsistencies, Petitioner has failed to demonstrate prejudice, in that the result of proceedings would have been different. Accordingly, Petitioner's claim fails.

With regard to Petitioner's claim that counsel failed to effectively cross-examine Lisa and impeach her with statements she made to Detective Tunnifcliffe. The inconsistencies that Petitioner specifies did not undermine Lisa's credibility. Whether she at first stated that Petitioner did not take anything from her, when the evidence established that the police later found the torn smock that Petitioner took from her and discarded, was inconsequential. This does not change the fact that Petitioner gave her a shirt to wear and the torn smock was located in a recycle bin at the apartment complex. Petitioner further alleges that Lisa's account of the assault varied. However, there was no discrepancy in her assertions that Petitioner struck her in the car on the way to the apartment and choked her while he had her pinned on the mattress. Lisa was not physically forced to orally copulate Petitioner, but his prior threats and assaults, along with the demand that she perform the act constituted the force with which the act was

1   accomplished.  The fact that when Lisa pleaded with Petitioner not to sodomize her, he complied,

2   has no bearing on the other acts performed by Petitioner.  In sum, Petitioner has failed to

3   demonstrate how more effective cross-examination or impeachment of Lisa would have altered

4   the results; thus, there was no prejudice.

5        In his traverse, Petitioner contends that counsel failed to interview the prosecution's

6   witnesses thereby resulting in the inability to effectively cross-examine and impeach these

7   witnesses resulting in arguing a further defense.  Petitioner elaborates at length regarding each

8   witness pointing to alleged inconsistencies or bias in their testimony.  However, even assuming

9   the alleged inconsistencies existed and counsel was deficient for failing to present certain cross-

10  examine, there is no reasonable probability that this evidence would have affected the verdict.

11  The cross-examination evidence that petitioner describes in his traverse would have done little to

12  discredit the prosecution witnesses.

13       A review of the trial transcripts reveals that defense counsel effectively cross-examined

14  the prosecution witnesses.  (See RT 287, 297-300, 305-307, 317, 366-370, 378-379, 427.)  To the

15  extent Petitioner is attempting to argue that counsel should have established that the bruise on

16  Lisa's body was caused after she left the hospital and that Lisa was not scratched by Petitioner,

17  Petitioner's claim is without merit.  As previously stated herein, the lack of physical force

18  utilized by Petitioner is immaterial to a finding of guilt on the underlying charges as fear of

19  imminent unlawful bodily harm is sufficient for a conviction of rape, kidnaping, and oral

20  copulation.  See Ca. Penal Code §§ 261(a)(2), 288a(c)(2), 209(b)(1).

21       Petitioner's defense at trial was limited, as the interview Petitioner had with Detective

22  Tunnicliffe was presented to the jury to which Petitioner admitted that he went to Lisa's place of

23  employment on the night in question and that the two had sex, albeit alleged consensual sex.  It

24  would have been ill advised for counsel to impeach or examine on issues that would be

25  inconsistent with this theory of defense.

26       With regard to Petitioner's claim that counsel did not adequately cross-examine Detective

27  Tunnicliffe with the fact that he did not observe any scratches on Lisa's body, it is without merit.

28  On cross-examination, counsel specifically asked Detective Tunnicliffe if he observed any

scratches on Lisa's neck area.  Detective Tunnicliffe's response was "Not the first time.  I don't

believe so."  (RT 557.)  Counsel further questioned as follows:

> Q.  Okay.  Well, when you saw her, did you see that you didn't - - did you look at her neck and not see any scratches?
> A.  No.  When I spoke with her, we were in a room, as I described it, with the other people.  She sat at a seat or a chair that was opposite of where I was seated.
> Q.  Okay.  Did she complain to you of any scratches to her neck area at the time that you first interviewed her?
> A.  I don't remember if she did at the first interview.
> Q.  Okay.  At what point did you become aware of these scratches to her neck?
> A.  For certain, during the second interview.
> Q.  And when was that?
> A.  The following day.

(RT 557.)  Accordingly, the fact that Detective Tunnicliffe did not initially observe any scratches

to Lisa's neck area was established during trial by defense counsel and Petitioner's claim to the

contrary is without merit.

> 7.    Failure to Properly Request and Argue Jury Instructions

Petitioner contends that counsel was ineffective for failing to request instructions and to

object to instructions requested by the prosecution.  Specifically, Petitioner contends that the

court instructed the jury with CALJIC 10.60, which obliterated the essential elements of each

crime the prosecution must prove beyond a reasonable doubt.  Petitioner contends that there was

a reasonable likelihood that the jury understood this instruction to permit a conviction based

upon the testimony of Lisa without any proof that she had been forced into any of the acts that

she claimed.

In his traverse, Petitioner contends that trial counsel should have requested CALJIC No.

2.50.1.

CALJIC No. 10.60 instructed the jury that it is not essential to a conviction of a charge of

rape or oral copulation that the testimony of the victim be corroborated.  Because this instruction

is a correct statement of the law in California,[4] any objection to this instruction would have been

futile and Petitioner fails to demonstrate that an objection would have been sustained.  United

---

[4] People v. Caudillo, 21 Cal.3d 562, 571 (1978); Ballard v. Superior Court, 64 Cal.2d 159, 171 (1966).

1    States v. Quintero-Barraza, 78 F.3d 1344, 1349 (9th Cir. 1996).

2           With regard to Petitioner's claim that trial counsel should have requested CALJIC No.

3    2.50.1, the Court of Appeal noted the following:

4           Failing to give CALJIC No. 2.50.1 created a new problem because the jury
        did not have any guidance on use of the preponderance of the evidence standard
5       provided by CALJIC No. 2.50.02.
        CALJIC No. 2.50.1 is based on Evidence Code section 403, subdivision
6       (c)(1) which provides that the court "[m]ay, and on request shall, instruct the jury
        to determine whether the preliminary fact exists and to disregard the proffered
7       evidence unless the jury finds that the preliminary fact does exist." The court
        does not have a sua sponte duty to provide this instruction to the jury. [citation].

8           Therefore, the issue becomes what harm occurred by providing the jury
        with the preponderance of the evidence instruction without explaining the
9       relevance of the instruction. In addition to the preponderance of evidence
        instruction, the court instructed the jury with CALJIC No. 2.61 [defendant may
10      rely on the state of the evidence]; CALJIC No. 2.90 [reasonable doubt]; CALJIC
        No. 17.10 [conviction of lesser offense after implied acquittal of charged offense];
11      CALJIC No. 17.01 [unanimity instruction]; and CALJIC No. 10.65 [criminal
        intent necessary for rape].

12          The prosecution and the defense referred to the need to prove defendant
        guilty beyond a reasonable doubt in closing argument. Neither the prosecution
13      nor the defense referred to the preponderance of the evidence standard.

14          The jury must decide whether the defendant committed the prior acts by a
        preponderance of the evidence before they may consider in their deliberations
15      such evidence in determining whether the defendant committed the charged
        crimes. [citation]. It is also well established that the prosecution must prove each
16      element of the crimes charged beyond a reasonable doubt and if the instructions
        fail to so instruct the jury, the judgment must be reversed. [citation].

17          The incomplete instruction on prior acts in this case left the jury to wonder
        why they were given the preponderance of the evidence standard. The
18      instructions did not tell the jury on what issues the preponderance standard should
        be applied. By giving the preponderance of the evidence instruction without
19      explaining its purpose, the court gave an abstract instruction, i.e., one which is
        correct in law but irrelevant. [citation]. It is error to give an abstract instruction.
20      [citation].

        In most instances, giving an abstract instruction constitutes technical error,
21      which does not require reversal. [citation]. The test is whether there is a
        reasonable likelihood that the jury misapplied the instruction. [citation].

22          After the incomplete instruction was given, the court instructed the jury on
        presumption of innocence [CALJIC No. 2.90], the elements of each crime, and
23      that the prosecution must prove each element beyond a reasonable doubt.
        Considering the instructions as a whole, [citation], and the circumstances of this
24      case, it is not reasonably likely that the jurors convicted defendant using a
        preponderance of the evidence standard.

25   (Respondent's Exhibit D, at 17-18.)

26          Considering the Court of Appeal's and this Court's determination (see infra section G)

27   that any defect in failing to give CALJIC No. 2.50.1 was harmless, it cannot be said that

28   Petitioner was prejudiced by counsel's failure to request this instruction. Accordingly,

1    Petitioner's claim fails on the merits.

2    D.    Prosecutorial Misconduct

3          Petitioner contends that the prosecutor committed misconduct by knowingly and

4    intentionally providing false information that Petitioner was previously convicted of rape, by

5    admitting into evidence Petitioner's statement to the police which the court excluded on hearsay

6    grounds, and by offering the testimony of Kelly Jones without providing defense counsel with

7    her statement.

8          Habeas petition will be granted for prosecutorial misconduct only when the misconduct

9    "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

10   Darden v. Wainwright, 477 U.S. 168, 171, 106 S.Ct. 2464 (1986) (quoting Donnelly v.

11   DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974)); see, Bonin v. Calderon, 59 F.3d

12   815, 843 (9th Cir. 1995).  To constitute a due process violation, the prosecutorial misconduct

13   must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."

14   Greer v. Miller, 485 U.S. 756, 765, 107 S.Ct. 3102, 3109 (1987) (quoting United States v.

15   Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985)). Under this standard, a petitioner must show that

16   there is a reasonable probability that the error complained of affected the outcome of the trial -

17   i.e., that absent the alleged impropriety, the verdict probably would have been different.

18         Petitioner alleges that the prosecutor admitted false evidence that he was previously

19   convicted of raping Lashanda C.  Petitioner's claim is unfounded.  Prior to trial, the prosecutor

20   filed a motion to admit evidence of other sex offenses and other acts of domestic violence

21   pursuant to California Evidence Code section 1108 and 1109.  (CT 115-130.)  Included in that

22   evidence was an allegation that, on October 7, 1997, Petitioner broke into the home of Lashanda

23   C., a woman who had previously broken off a dating relationship with Petitioner, and struck her

24   repeatedly and forced her to have sex with him in front of her small children.  (CT 120-121.)

25   The prosecutor represented in the motion that Petitioner was charged with battery, false

26   imprisonment, vandalism and trespassing, and that, following a plea bargain, Petitioner pled

27   guilty to misdemeanor trespass.  (CT 121.)  The prosecutor did not represent that Petitioner was

28   charged with or convicted of rape.

1    During the California Evidence Code section 402 hearing regarding the admissibility of

2  this evidence, Lashanda C. testified to the facts surrounding this and other incidents (RT 4-27),

3  and then Petitioner testified that he pled guilty to trespassing.  (RT 43.)  The court ruled that

4  portions of Lashanda's testimony regarding the incident were admissible, and other portions were

5  not.  (RT 44, 53-54.)

6    At trial, Lashanda C. testified that, in October of 1997, Petitioner followed her into her

7  bedroom, locked the door, and threw her on the bed.  He sat on her chest and held her wrists

8  down.  (RT 608-609.)  On another occasion, he slapped her in the face approximately three

9  times.  (RT 611.)  There was no testimony that Petitioner raped Lashanda.  Although during her

10  testimony at the California Evidence Code section 402 hearing Lashanda testified that Petitioner

11  forced her to perform oral sex (RT 10), there was no testimony of that act during her trial

12  testimony, and the prosecutor did not represent that Petitioner had previously been convicted of

13  rape or any other sex crime.  Petitioner's claim of prosecutorial misconduct is without merit.

14    Petitioner's contention that Lashanda's testimony did not establish a rape or domestic

15  violence or abuse, is not cognizable in this forum.  Petitioner contends that Lashanda's testimony

16  merely established verbal abuse far short of "domestic abuse."  Petitioner's claim of a

17  misinterpretation of state law is not cognizable in a habeas petition filed pursuant to section

18  2254.[5]  Habeas corpus relief is not available to correct alleged errors in the state court's

19

20    [5] In rejecting Petitioner's claim on direct appeal, the Court of Appeal held as follows:
        The thrust of [Petitioner's] first argument is the charges he faced at trial, kidnaping, rape

21  and oral copulation, did not constitute acts of domestic violence within the meaning of Penal Code
    section 13700.  Therefore, according to [Petitioner], the trial court erred in relying on Evidence
    Code section 1109 to admit the testimony.

22        Penal Code section 13700 defines domestic violence as abuse committed against an adult
    who is a cohabitant or former cohabitant.  Abuse has at least three distinct meanings in this statute.

23  First, abuse is intentionally or recklessly causing bodily injury.  Second, abuse is intentionally or
    recklessly attempting to cause bodily injury.  Third, abuse it intentionally or recklessly placing

24  another person in reasonable apprehension of imminent serious bodily injury. . . .
        Penal Code section 261 defines rape as 'an act of sexual intercourse accomplished with a

25  person not the spouse of the perpetrator, . . . [¶] . . . [¶] (2) [w]here it is accomplished against a
    person's will by means of force, violence, duress, menace, or fear of immediate and unlawful

26  bodily injury on the person of another.' [Citations]" The acts described in Penal Code section 261
    fall within the definition of domestic violence found in Penal Code section 13700.  Therefore,

27  [Petitioner] was accused of an offense involving domestic violence within the meaning of Evidence
    Code section 1109.

28

17

1  application or interpretation of state law.  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475,

2  480 (1991); Middleton v. Cupp, 768 F.2d 1083, 1084-85 (9th Cir.1985).

3       Petitioner further alleges that the prosecutor should not have admitted the tape-recorded

4  statement he made to detective Scott Tunnicliffe because the court had excluded the tape

5  following the prosecutor's objection that the tape was hearsay.  Prior to trial, the prosecutor did

6  object to the admissibility of Petitioner's statements on hearsay grounds, and the objection was

7  sustained.  (RT 81-82.)  Subsequently, during detective Tunnicliffe's testimony, the prosecutor

8  played the redacted tape to the jury.  (RT 546.)  The court stated on the record that the tape was

9  being introduced "consistent with our earlier discussion, Counsel."  (RT 546.)  It was clear from

10  the court's comment that the prosecutor withdrew any objection to the admissibility of the tape.

11  It is also clear that defense counsel at no time objected to the tape.  Although the unredacted

12  version of Petitioner's statement contained references to Petitioner's prior conduct with Lashanda

13  and references to Petitioner's criminal history (CT 322-324, 347), those portions were redacted

14  and were not contained in the version heard by the jury.  (CT 234-287.)

15       As Respondent submits, it is obvious from the record that, although the court initially

16  ruled that the tape was inadmissible, it later reversed the ruling.  It was the prosecutor who

17  objected to the tape, and it was ultimately the prosecutor who admitted it into evidence.  There

18  was no prosecutorial misconduct.

19       Further, as Respondent submits, Petitioner does not demonstrate that he was prejudiced

20  by the admission of the tape, nor may any prejudice be inferred from the record.  Petitioner did

21  not testify at trial, and his statement to detective Tunnicliffe provided his theory of the defense,

22  which was that he had sex with Lisa but that the acts were consensual.  The redacted version of

23  the tape did not prejudice Petitioner.

24       Finally, with respect to Petitioner's claim that the prosecutor failed to disclose to defense

25  counsel a summary of the testimony of Kelly Jones until just prior to her testimony, it is without

26  merit.  Defense counsel at no time objected to the testimony or complained that the prosecutor

27

28  (Respondent's Exhibit D, at 9-10.)

failed to timely disclose the nature of her testimony.  Failure to disclose exculpatory evidence violates due process only where the evidence is material to guilt or punishment.  Brady v. Maryland, 373 U.S. 83, 87 (1963).  Petitioner does not identify what was undisclosed, how it was material and exculpatory, or how it affected the verdict.  This claim fails to allege a due process violation.  Phillips v. Woodford, 267 F.3d 966, 987 (9th Cir. 2001); United States v. Barker, 988 F.2d 77, 78 (9th Cir. 1993).

In any event, Petitioner's allegations of prejudice are belied by the record.  In the amended petition, Petitioner contends that "Prior to K. Jones taking the stand to testify, the prosecution handed defense counsel a copy of her statement.  This gave counsel only minutes to review her prior statement before she testified.  Counsel was surprised and unprepared to properly cross-examine this witness."  (Amd. Petition, at 18.)

The record reveals that defense counsel effectively cross-examined witness Jones.  Jones testified that she worked with Lisa and that, when she got off work on the night in question and was outside waiting for her ride, she heard Lisa call out her name several times.  (RT 373-374.)  She saw Petitioner putting a bicycle in the trunk of Lisa's car.  As Jones watched, Petitioner asked her in a stern voice, "What the fuck she was looking at."  (RT 377.)

As Respondent submits, on cross-examination, defense counsel got Jones to admit that Lisa did not appear to be distressed when she called out Jones's name, and Jones did not believe that she needed help.  (RT 378.)  Jones did not observe a struggle or an argument, and if Lisa had screamed, Jones would have called the police.  (RT 379.)  Defense counsel reminded the jury of Jones's testimony and of the relevance of her admission that she did not observe a scuffle or hear a cry or help.  (RT 673-674.)

E.    Insufficient Evidence

Petitioner contends that there was insufficient evidence to support his conviction.  Specifically, Petitioner argues that the physical examination of the victim by nurse Johnson were inconclusive as to either of the assaults.  There was no bruising, abrasions, or swellings to Lisa's body to support the claim that she was punched, hit, choked, or forced into her car.  Further, there was no redness, tears, or abrasions to Lisa's vaginal area.  The only evidence of physical assault

19

1    were scratches to Lisa's face, neck, and chest area.  Petitioner claims however that no one

2    bothered to take any fingernail scrapings to see who made those scratches.

3         1.    Procedural Default

4         Respondent argues that this claim is procedurally defaulted.  The Supreme Court denied

5    this claim in Petitioner's petition for writ of habeas corpus citing, In re Dixon, 41 Cal.2d 756,

6    264 P.2d 513, 514-15 (1953), which stands for the proposition that, in California, issues that

7    should have been raised on appeal, such as insufficiency of the evidence, may not be raised in a

8    subsequent petition for writ of habeas corpus.

9         A federal court will not review a petitioner's claims if the state court has denied relief of

10   those claims pursuant to a state law that is independent of federal law and adequate to support the

11   judgment.  Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Coleman v. Thompson, 501 U.S. 722,

12   729-30 (1989); See also, Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935).  In such a case,

13   Petitioner is deemed to have procedurally defaulted his claims.  This doctrine of procedural

14   default is based on concerns of comity and federalism. Coleman, 501 U.S. at 730-32.

15        There are limitations as to when a federal court should invoke procedural default and

16   refuse to evaluate the merits of a claim because the petitioner violated a state's procedural rules.

17   Procedural default can only block a claim in federal court if the state court "clearly and expressly

18   states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263

19   (1989).  For California Supreme Court decisions, this means the Court must specifically have

20   stated that it denied relief on a procedural ground. Ylst v. Nunnemaker, 501 U.S. 797, 803

21   (1991); Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1993); Hunter v. Aispuro, 982 F.2d

22   344, 347-48 (9th Cir. 1991).  If the California Supreme Court denies a petitioner's claims without

23   any comment or citation, the federal court must consider that it is a decision on the merits.

24   Hunter v. Aispuro, 982 F.2d at 347-48.

25        In this case, the California Supreme Court denied the petition with a citation to In re

26   Dixon, 41 Cal.2d 756, 759, 264 P.2d 513 (1953) on May 14, 2003.  (Respondent's Exhibit P.)  A

27   citation to In re Dixon by the California courts denotes a procedural default which occurs when

28   claimed errors could have been, but were not raised in a habeas petition on direct appeal from

1  conviction. <u>Dixon</u>, 264 P.2d at 515.  The California Supreme Court reiterated this finding by

2  citing to <u>In re Dixon</u> in its denial. The state courts' citation to <u>Dixon</u> fulfills the requirement in

3  <u>Harris v. Reed</u> that the state court "clearly and expressly state that its judgment rests on a state

4  procedural bar." <u>Harris</u>, 489 U.S. at 263.

5          Next, a federal court may only impose a procedural bar on claims if the procedural rule

6  that the state used to deny relief is "firmly established and regularly followed." <u>O'Dell v.</u>

7  <u>Thompson</u>, 502 U.S. 995, 998 (1991) (statement of Blackmun joined by Stevens and O'Connor

8  respecting the denial of certiorari); <u>Ford v. Georgia</u>, 498 U.S. 411, 423-24 (1991); <u>James v.</u>

9  <u>Kentucky</u>, 466 U.S. 341, 348-51 (1984).  The state procedural rule used must be clear,

10  consistently applied, and well-established at the time of the petitioner's purported default. <u>Fields</u>

11  <u>v. Calderon</u>, 125 F.3d 757, 760 (9th Cir. 1997); <u>Calderon v. United States Dist. Court (Bean)</u>, 96

12  F.3d 112, 129 (9th Cir. 1996), *cert. denied,* 117 S.Ct. 1569.  The <u>Dixon</u> procedural rule is firmly

13  established and regularly followed in California. <u>See</u> <u>In re Seaton</u>, 34 Cal.4th 193, 199, 95 P.3d

14  896, 900, 17 Cal.Rptr.3d 633, 637 (2004), *as modified in* <u>In re Seaton</u>, 2004 WL 2186674

15  (2004); <u>In re Harris</u>, 5 Cal.4th 813, 829 (1993).

16          The Court must next determine whether the state procedural ground is independent and

17  adequate. If so, "federal habeas review is barred unless the prisoner can demonstrate cause for the

18  procedural default and actual prejudice, or demonstrate that the failure to consider the claims will

19  result in a fundamental miscarriage of justice." <u>Noltie v. Peterson</u>, 9 F.3d 802, 804-805 (9th Cir.

20  1993); <u>Coleman</u>, 501 U.S. at 750; <u>Park</u>, 202 F.3d at 1150.

21          _____a.      <u>Independent</u>

22          "For a state procedural rule to be 'independent,' the state law basis for the decision must

23  not be interwoven with federal law." <u>LaCrosse</u>, 244 F.3d at 704, *citing,* <u>Michigan v. Long</u>, 463

24  U.S. 1032, 1040-41 (1983); <u>see also</u> <u>Morales v. Calderon</u>, 85 F.3d 1387, 1393 (9th Cir. 1996),

25  *quoting,* <u>Coleman</u>, 501 U.S. at 735 ("Federal habeas review is not barred if the state decision

26  'fairly appears to rest primarily on federal law, or to be interwoven with federal law.'"). "A state

27  law is so interwoven if 'the state has made application of the procedural bar depend on an

28  antecedent ruling on federal law [such as] the determination of whether federal constitutional

21

1  error has been committed.'" Park, 202 F.3d at 1152, *quoting,* Ake v. Oklahoma, 470 U.S. 68, 75

2  (1985)).

3         The Ninth Circuit has concluded that, prior to 1998, a California court's evaluation of

4  Dixon and its exceptions were not independent of federal law so as to bar federal review. See

5  Park v. California, 202 F.3d 1146, 1152-53 (9th Cir.2000).  For denials subsequent to the 1998

6  California decision in In re Robbins, 18 Cal.4th 770, 77 Cal.Rptr.2d 153, 959 P.2d 311 (1998),

7  the Ninth Circuit suggested that the analysis would be substantially different:

8         The California Supreme Court has adopted in Robbins a stance from which it will
       now decline to consider federal law when deciding whether claims are
9         procedurally defaulted.... The purpose of this approach was to establish the
       adequacy and independence of the State Supreme Court's future Dixon/ Robbins
10        rulings and to indicate that a prisoner seeking collateral relief with respect to new
       federal claims no longer had any recourse to exhaust in the state courts.... Robbins
11        is clear, however, that its new approach is prospective.

12  Park v. California, 202 F.3d 1146, 1152-53, 1152 n. 4. (9th Cir. 2000), *citing,* In re Robbins, 959

13  P.2d at 338-39.  In Bennett v. Mueller, 322 F.3d 573, 582-583 (2002), the Ninth Circuit applied

14  Robbins prospectively, finding California's procedural bar of untimeliness to be independent of

15  the federal law.

16         With respect to the Dixon rule, the Ninth Circuit has held that a relevant point of

17  reference for assessing its application is the time at which the petitioner "had an opportunity to

18  raise the claims on direct appeal." Calderon v. U.S. Dist. Ct. For E.D. of Cal., 103 F.3d 72, 75

19  (9th Cir.1996), *cert. denied*, 521 U.S. 1129 (1997). See also, Calderon v. Bean, 96 F.3d 1126,

20  1131 (9th Cir.1996), *cert. denied*, 520 U.S. 1204 (1997) (evaluating the Dixon rule "at the time

21  Bean filed his direct appeal"). Because the Dixon rule precludes collateral review of a claim that

22  could have been brought on direct appeal, the procedural default, though announced by the

23  California Supreme Court when the habeas petition is denied, technically occurs at the moment

24  the direct appeal did not include those claims that should have been included for review. Fields v.

25  Calderon, 125 F.3d 757, 761 (9th Cir. 1997).  In this case, that moment is 2001, the year of

26  Petitioner's direct appeal.  Applying Robbins prospectively, the Dixon bar is independent of

27  federal law.

28  ///

1        b.    Adequate

2        To be deemed adequate, the state law ground for decision must be well-established and

3 consistently applied.  Bennett, 322 F.3d at 583; Poland v. Stewart, 169 F.3d 573, 577 (9th Cir.

4 1999) ("A state procedural rule constitutes an adequate bar to federal court review if it was

5 'firmly established and regularly followed' at the time it was applied by the state court."),

6 quoting, Ford v. Georgia, 498 U.S. 411, 424 (1991).  Although a state court's exercise of judicial

7 discretion will not necessarily render a rule inadequate, the discretion must entail "'the exercise

8 of judgment according to standards that, at least over time, can become known and understood

9 within reasonable operating limits.'" Wood v. Hall, 130 F.3d 370, 377 (9th Cir.1997), quoting,

10 Morales v. Calderon, 85 F.3d 1387, 1392 (9th Cir.1996).

11        There is a genuine question whether California's Dixon bar is adequate, and the record

12 before the Court does not provide a means for answering this question.  Nevertheless, this issue

13 is resolved with the parties' burdens of proof.  The ultimate burden of proving the adequacy of

14 the rule is upon the State.  But "[o]nce the state has adequately pled the existence of an

15 independent and adequate state procedural ground as an affirmative defense, the burden to place

16 that defense in issue shifts to the petitioner." Bennett, 322 F.3d at 585-586.  "The petitioner may

17 satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the

18 state procedure, including citation to authority demonstrating inconsistent application of the

19 rule." Id. at 586.  Respondent has adequately pled the existence of the Dixon bar.  The burden

20 thus shifts to Petitioner.  Petitioner has failed to carry his burden by demonstrating the bar's

21 inadequacy. Accordingly, the Dixon bar is adequate in this case.

22        c.    Exceptions to Procedural Default

23        Where, as here, the court finds an independent and adequate state procedural ground,

24 federal habeas review is barred unless the prisoner can demonstrate cause for the procedural

25 default and prejudice, or demonstrate that the failure to consider the claims will result in a

26 fundamental miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).

27        1.    Cause and Prejudice/Miscarriage of Justice

28        The Court may reach the merits of procedurally defaulted claims if the petitioner can

23

1   show cause and prejudice to excuse his default.  The cause standard requires the petitioner to

2   show that "some objective factor external to the defense" impeded his efforts to comply with the

3   state's procedural rule, Murray v. Carrier, 477 U.S. 478, 488 (1986), or to establish

4   constitutionally ineffective assistance of counsel, McClesky v. Zant, 499 U.S. 467, 494 (1991).

5   To satisfy the prejudice prong of the cause and prejudice test, the Petitioner must show actual

6   prejudice resulting from the errors of which he complains.  Id.

7        The miscarriage of justice exception allows a federal court to hear the merits of the

8   procedurally defaulted claims if the failure to hear the claims would constitute a "miscarriage of

9   justice."  See Sawyer v. Whitley, 505 U.S. 333, 339-40 (1992) (citations omitted).  In the federal

10  habeas corpus context, the "miscarriage of justice" exception is limited to habeas petitioners who

11  can show that "a constitutional violation has probably resulted in the conviction of one who is

12  actually innocent."  Schlup v. Delo, 513 U.S. 298, 327 (1995).  The required evidence must

13  create a colorable claim of actual innocence, that the petitioner is innocent of the charge for

14  which he is incarcerated, as opposed to legal innocence which is innocence as a result of legal

15  error.  See id. at 321, 329.  It is not enough that the evidence show the existence of reasonable

16  doubt; petitioner must show that "it is more likely than not that no 'reasonable juror' would have

17  convicted him."  Id. at 329.

18       Petitioner makes no attempt to demonstrate cause and/or  prejudice in his Traverse.  As

19  noted above, the Traverse only reasserts his federal claims. However, even had Petitioner

20  demonstrated cause and/or prejudice, there is no miscarriage of justice because as Respondent

21  argues, and this Court finds, there is no merit to his claim.

22       2.    Sufficiency of Evidence

23       The law on insufficiency of the evidence claim is clearly established.  The United States

24  Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

25  federal court must determine whether, viewing the evidence and the inferences to be drawn from

26  it in the light most favorable to the prosecution, any rational trier of fact could find the essential

27  elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

28  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

1      As previously stated, Petitioner contends that, because physical evidence of a forcible

2 assault was inconclusive "there was no conclusive or credible [evidence] presented in trial, that

3 proved petitioner had in fact forced Lisa into the claimed acts."

4      Initially, the Court notes that Petitioner challenges the sufficiency of the evidence as to

5 each of the charges - kidnap, rape, and oral copulation.  Sufficient evidence supports all of the

6 convictions.

7      At trial, Lisa testified that on October 10, 1998, after leaving her place of work at 11:30

8 p.m., Petitioner approached her as she was attempting to get into her vehicle.  (RT 205.)

9 Petitioner indicated that he wanted to talk to her.  (Id.)  She told him she was tired, did not want

10 to talk, and wanted to go home.  (Id.)  Petitioner got upset and told her she was going to talk to

11 him.  (RT 205-206.)  He then grabbed her keys and pushed her over into the passenger's side seat

12 of the vehicle stating that she was going to talk to him that night.  (RT 206.)  Petitioner got into

13 the driver's side and drove off in the vehicle.  (Id.)  Petitioner stopped the vehicle and got out to

14 put his bicycle in the car that he had ridden to her place of work, when Lisa got out of the car and

15 took off running.[6]  (RT 206.)   She ran about twenty feet when Petitioner grabbed her by the back

16 of her shirt.  (RT 208.)  He hit her and pushed her into a fence.  (Id.)  She testified that he

17 "grabbed [her] really hard and just kind of hit [her] with a closed fist in the back of [her] left side

18 of [her] head."  (Id.)  She yelled out a coworker's name and Petitioner told her to shut up and not

19 attempt to scream anyone's name.  (RT 208-209.)  He then walked her back to the vehicle, put

20 her in the passenger's side seat, and put his bicycle in the trunk.  (RT 209.)  Petitioner proceeded

21 to drive off screaming at Lisa to shut up as he was going to do all the talking and she was to

22 listen to what he had to say.  (RT 235-236.)  He drove to the apartment the two had previously

23 shared on Chester Lane.  (RT 236.)  During the twenty minute drive to the apartment from the

24 Convalescent Hospital, Petitioner was yelling that she left him, his PG&E was shut off, and he

25 received an eviction notice and all of it was because of her.  (RT 237.)  Petitioner told Lisa

26 numerous time that he didn't care if he or she lived or died or whether she saw her children

27

28        [6] Lisa indicated she was scared because Petitioner did not seen to be himself that night.  (RT 207.)

1   again.  (RT 239.)

2   When the two arrived at the apartment complex, he grabbed Lisa's arm and took her out

3   of the car.  (RT 240.)  The two walked to the apartment, while Petitioner was still holding her by

4   the arm.  (RT 241.)  Petitioner then lead Lisa up the stairs to the bedroom.  (RT 242-243.)  He

5   then immediately told her in a mean voice to "strip buck naked."  (RT 243.)  Lisa out of fear

6   reluctantly complied.  (RT 243.)  Petitioner then took her clothes downstairs, while she sat in the

7   corner of the bedroom.[7]  (RT 244-245.)  When Petitioner returned he had a wooden drum stick

8   that you play an instrument with.  He approached Lisa with it as if he was going to hit her.  (RT

9   246.)  Petitioner stated "I ought to just beat your ass."  (Id.)  Petitioner subsequently threw the

10  stick and instructed Lisa to get on the bed.  (Id.)  He then "crouched over [her], and he placed his

11  hands around [her] neck" and began choking her as she tried to grasp for air.  (RT 248.)  He then

12  told her to put her legs up and he started to perform oral sex on her.  (RT 248-252.)  He then

13  demanded that she perform oral sex on him.  (RT 252-253.)  Lisa gave into his demands as she

14  feared for her safety.  (RT 253.)  Petitioner next ordered her to get on her hands and knees and

15  proceeded to have intercourse with her "doggie" style."  (RT 253.)

16  Petitioner then left the apartment on his bike, Lisa went downstairs (still naked) and

17  attempted to find her car keys and clothing, but she was unable to locate them.  (RT 257.)  She

18  thought about leaving but realized that Petitioner may have been tricking her into thinking that he

19  had left and would cause her further harm if she attempted to leave.  (RT 257-258.)  Petitioner

20  returned approximately six or seven minutes later, with a soft drink for Lisa.  (RT 258.)

21  Lisa was able to calm Petitioner down with her assurance that she was ready to move

22  back in with him and restart their relationship.  Petitioner asked her to have sexual intercourse

23  with him again, to which she complied because she felt if she did not he would not let her leave.

24  (RT 265-266.)  Petitioner obtained Lisa's clothing, however, he instructed Lisa not to put on her

25  uniform shirt as it was torn.  (RT 267.)  He instead gave her one of his T-shirts.  (Id.)  Petitioner

26  kept the torn smock that she had worn to work.  (RT 539-540.)  The smock was later discovered

27

28   _____
    [7]  Lisa had been wearing a blue uniform scrub with a zoo animal print and blue pants.  (RT 244.)

by the police stuffed in the lifting sleeve of a garbage receptacle at Petitioner's apartment

complex. (RT 539-540.)    Both Petitioner and Lisa observed scratches on her neck. (RT 268.)

During the initial confrontation near Lisa's place of employment, she lost an earring and a

cross from a necklace, which the police found near where she and Petitioner had struggled in the

parking lot. (RT 402-402.)

Lisa's testimony that the assaults were forcible was corroborated by the physical evidence

of the scratches on her neck, her torn smock, and the jewelry which she lost during the initial

struggle.  Further, Lisa's testimony at trial was consistent with the statements she gave to police

officers O'Nesky and Tunnicliffe. (RT 446-454, 515-537.)  Although there was no injury to

Lisa's vaginal area, the medical expert testified that the findings were not inconsistent with her

account of the assaults. (RT 420-421.)  The jury obviously believed Lisa's testimony and her

testimony certainly supports the jury's finding that the assaults were forcible and Petitioner was

guilty of kidnaping, rape, and oral copulation.  The credibility of Lisa's testimony is beyond the

scope of sufficiency of evidence review.  Schlup v. Delo, 513 U.S. 298, 330 (1995).  Evidence

or actual violence is not required for a conviction of kidnaping, rape or oral copulation.  Threats

of fear is sufficient to support a conviction for kidnaping and rape.  See Ca. Penal Code §§

261(a)(2), 288a(c)(2), 209(b)(1). Thus, the lack of substantial physical alteration to the victim's

body is immaterial to a finding of guilt on the charged offenses.

Based on the evidence adduced at trial, the Court finds that sufficient evidence supports

Petitioner's convictions and the claim must be denied.

F.    California Evidence Code 1109 - Due Process/Equal Protection

Petitioner contends that California Evidence Code section 1109, as applied in this case,

violated his rights to due process and equal protection.   Petitioner contends that section 1109

should not have been applied in the instant case as his charges were unrelated to domestic

violence/abuse being that he was charged with and convicted of kidnaping, oral copulation, and

rape.

The Supreme Court has held that the equal protection clause means "that no State shall

deny to any person within its jurisdiction the equal protection of the laws, which is essentially a

direction that all persons similarly situated should be treated alike." City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985); Clark v. California, 123 F.3d 1267, 1270 (9th Cir. 1997). The first step in any equal protection analysis is to identify petitioner's classification or group. Freeman v. City of Santa Ana, 68 F.3d 1180, 1187 (9th Cir. 1995). Petitioner must show that the law has been applied in a discriminatory manner on him or imposes different burdens on different groups. Id.; Christy v. Hodel, 857 F.2d 1324, 1331 (9th Cir. 1988). The second step requires the Court to determine the level of scrutiny with which the Court should review the statute. Freeman, 68 F.3d at 1187. Discrimination on the basis of race or national origin and discrimination that affects fundamental rights are subject to strict scrutiny. Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914 (1988).

A state's criminal law (such as an evidence law pertaining to criminal trials) does not violate the Due Process Clause "unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Montana v. Egelhoff, 518 U.S. 37 (1996).

Initially, the Court notes that to the extent Petitioner claims that the prior acts of domestic abuse admitted under section 1109 did not constitute domestic violence within the meaning of the statute, does not raise a federal constitutional question, as it is purely an interpretation of state law. A federal court has no basis for disputing a state's interpretation of its own law. Clemons v. Mississippi, 494 U.S. 738, 739-40 (1990).

California Evidence Code section 1109 provides in relevant part:

> (a) [I]n a criminal action in which the defendant is accused of an offense involving domestic violence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352. . . ..

(d) As used in this section, "domestic violence" has the meaning set forth in Section 13700 of the Penal Code.

California Penal Code section 13700 provides in pertinent part:

As used in this title:

> (a) "Abuse" means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of

imminent serious bodily injury to himself or herself, or another.

(b) "Domestic Violence" means abuse committed against an adult or a fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship.  For purposes of this subdivision, "cohabitant" means two unrelated adult persons living together for a substantial period of time, resulting in some permanency of relationship.  Factors that may determine whether persons are cohabiting included, but are not limited to, (1) sexual relations between the parties while sharing the same living quarters, (2) sharing of income or expenses, (3) joint use or ownership of property; (4) whether the parties hold themselves out as husband and wife, (5) the continuity of the relationship, and (6) the length of the relationship.

The Court of Appeal rejected Petitioner's claim finding no due process or equal protection violation.[8]  The Court of Appeal's decision is not contrary to or, an unreasonable application of Supreme Court precedent.

As Respondent submits, although Petitioner alleges an equal protection violation, he does not allege facts sufficient to establish that California Evidence Code section 1109 creates "a prima facies case of uneven application."  Petitioner prefaces his claim on the fact that persons charged with violent crimes which involve domestic violence are subject to the provisions of California Evidence Code section 1109 which permit evidence of prior acts of domestic violence, whereas persons charged with other crimes are not.

Petitioner has not alleged that there was a discriminatory purpose behind the differential treatment.  Thus, Petitioner has failed to allege, let alone prove, that any of the alleged actions were motived by a discriminatory intent.  Petitioner has not demonstrated that the application of section 1109 to crimes involving domestic violence is a suspect or quasi-suspect class.  In any event, as set forth in Smith v. Roe, 232 F.Supp.2d 1073, 1085 (C.D. 2002), California appellate courts have articulated a rational basis for application of the statute based on the repetitive and

---

[8]  Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

secretive nature of domestic violence, which consists of acts that are embarrassing and

intimidating, and often involve victims who are uncooperative due to the relationship with the

perpetrator.  Difficulties with proof often result from uncooperative victims and third-party

witnesses who are frequently children or neighbors.  (citing People v. Jennings, 81 Cal.App.4th

1301, 1313 (2000); People v. Brown, 77 Cal.App.4th 1324, 1333 (2000) (quoting a California

State Assembly committee's bill analysis prepared for Cal. Evid. Code § 1109.)  Accordingly,

Petitioner's equal protection claim fails.

Petitioner further alleges that section 1109 violated his due process rights.  The court has

found no binding federal case addressing the constitutionality of section 1109.

In Estelle v. McGuire, 502 U.S. 62, 69-70 (1991), the Supreme Court held that the

admission of evidence of prior batteries of the victim (defendant's child) that were of a serious

and repetitive nature of establish the non-natural nature of the victim's death, did not violate the

defendant's due process rights because the evidence was relevant to the issues of whether the

victim's death was caused by an intentional act, an element of the charge of second-degree

murder.  The Supreme Court declined to express an opinion as to whether a state law would

violate due process if it permitted the use of prior crimes evidence to show propensity to commit

a charged crime.  Id. at 75, n.5.

In United States v. LeMay, 260 F.3d 1018, 1027 (9th Cir. 2001), the Ninth Circuit found

Federal Rule of Evidence 414, an analogous rule to section 1109, to be constitutional on its face

and not violative of due process.  Federal Rule 414 governs the admissibility of prior conduct in

cases of child molestation.  Federal Rule 414 authorizes the admission, in criminal cases

involving charges of child molestation, evidence of the defendant's commission of other acts of

child molestation "for its bearing on any matter to which it is relevant."  Fed. R. Evid. 414(a).

That rule, like section 1109, is subject to a determination if "its probative value is substantially

outweighed by the danger of unfair prejudice."  United States v. LeMay, 260 F.3d at 1026, 1028.

The court reasoned that was no due process concern when the admissibility of the evidence was

safeguarded by the protections under Rule 403.  Here, like in LeMay, admission of evidence

under section 1109, is subject to a California Evidence Code § 352 determination, which

determines if the probative value is substantially outweighed by its prejudicial effect. Because this safeguard is in place, it follows that no due process violation has occurred by admission of the evidence pursuant to California Evidence Code section 1109. Absent Supreme Court authority finding that admission of evidence pursuant to section 1109, or other sections like it is unconstitutional, the state court's determination was not contrary to or, an unreasonable application of, clearly established Supreme Court precedent.

G.   Instructional Error

Petitioner contends that the trial court's giving of CALJIC No. 2.50.02, coupled with the preponderance of the evidence standard, significantly diluted the government's burden of proof, violating his due process rights. Petitioner contends that admission of evidence under California Evidence Code section 1109 allows the jury to equate guilt of the uncharged crime with guilt of the charged crime because the Petitioner has the disposition to commit such crimes. Petitioner reasons that inferring that he had the disposition to commit the charged crimes is equivalent to inferring that he is guilty of the charged crimes. Petitioner contends that the trial court did not instruct the jury that the prosecution merely had to prove the other crimes by a preponderance of the evidence.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action. See, Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See, id. at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See, United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710

1 | (1993) (whether the error had a substantial and injurious effect or influence in determining the

2 | jury's verdict.).  See, Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of

3 | demonstrating that an erroneous instruction was so prejudicial that it will support a collateral

4 | attack on the constitutional validity of a state court's judgment is even greater than the showing

5 | required to establish plain error on direct appeal."  Id.

6 |      In rejecting Petitioner's claim on direct appeal, the Court of Appeal held that any error by

7 | the trial court's failure to give CALJIC No. 2.50.1, along with 2.50.2, was harmless.  The state

8 | courts' determination is not contrary to or, an unreasonable application of, clearly established

9 | Supreme Court precedent.  As the Court of Appeal stated, "the issue becomes what harm

10 | occurred by providing the jury with the preponderance of the evidence instruction without

11 | explaining the relevance of the instruction."  (Respondent's Exhibit D, at 17.)  In reviewing the

12 | totality of the circumstances and other instructions given to the jury, the Court of Appeal

13 | properly concluded that "it is not reasonably likely that the jurors convicted [Petitioner] using a

14 | preponderance of the evidence standard."  (Id. at 18.)

15 |      Although the Court of Appeal noted that CALJIC No. 2.50.02 is normally given in

16 | conjunction with CALJIC No. 2.50.1, Petitioner was not harmed by providing the jury with the

17 | preponderance of the evidence instruction relating to the prior acts without explaining the

18 | relevance of it.  As stated by the Court of Appeal, the jury was instructed that the prosecution

19 | must prove each element of the crimes charged beyond a reasonable doubt.  (CALJIC 2.90; CT

20 | 158.)  Further, the court was instructed with CALJIC No. 2.61 [defendant may rely on the state of

21 | the evidence; CALJIC No. 2.90 [reasonable doubt]; CALJIC No. 17.10 [conviction of lesser

22 | offense after implied acquittal of charged offense]; CALJIC No. 17.01 [unanimity instruction];

23 | and CALJIC No. 10.65 [criminal intent necessary for rape].

24 |      The Court of Appeal's decision that given the elements of the crime, and the presumption

25 | of innocence, and that the prosecution was required to prove the elements of the crime beyond a

26 | reasonable doubt, it was not reasonably likely that the jurors convicted Petitioner using a

27 | preponderance of the evidence standard.  This determination is not contrary to or an unreasonable

28 | application of Boyde v. California, 494 U.S. 370, 380-381 (1990), which holds that the standard

1  of review of instructions is whether it is reasonably likely that the jury applied the challenged

2  instructions in a way that violates the Constitution.  See also Weeks v. Angelone, 528 U.S. 225,

3  236 (2000).

4      Petitioner's claim that utilizing a preponderance of the evidence standard to determine

5  whether the prior acts of domestic abuse occurred, is tantamount to utilizing a preponderance of

6  the evidence standard to convict of the underlying charged offenses.  Petitioner's claim is

7  without merit.  CALJIC No. 2.50.02 does not address any of the elements of the crimes for which

8  Petitioner was charged, nor did it require a jury's finding that the prior acts occurred.  The

9  instruction merely instructed that the juror may, but were not required to, infer from any prior

10  conduct that Petitioner had a disposition to commit crimes of domestic violence.

11      Even if Petitioner did establish a due process violation arising out of the trial court's

12  failure to give CALJIC No. 2.50.1, such error was harmless as it did not have a "substantial and

13  injurious effect or influence in determining the jury's verdict.  Brecht v. Abrahamson, 507 U.S.

14  619, 638 (1993).   As stated by the Court of Appeal, the prosecution and the defense referred to

15  the need to prove Petitioner guilty beyond a reasonable doubt in closing argument.  (RT 651,

16  660, 671-672.)  Neither the prosecution nor the defense referred to the preponderance of the

17  evidence standard.  Further, as explained supra under section E, there was strong evidence aside

18  from the propensity evidence that Petitioner committed the charged crimes.  Moreover, as stated

19  by the Court of Appeal, the trial court eliminated the offending portion of CALJIC No. 2.50.02

20  which stated, "If you find that the defendant had this disposition, you may, but are not required

21  to, infer that [he] was likely to commit and did commit the crime [or crimes] of which [he] is

22  accused." (CT 151; CALJIC 2.50.02 (1997 edition).[9]  Therefore, it cannot be said the giving of

23  CALJIC 2.50.02 and 2.50.2 or the failure to give CALJIC No. 2.50.1 had a "substantial and

24  injurious effect on the outcome of the verdict." Brecht v. Abrahamson, 507 U.S. 619, 638

25

26      [9] This elimination makes the instant case distinguishable from Gibson v. Ortiz, 387 F.3d 812, 821-823 (9th Cir. 2004), wherein the Ninth Circuit held that in giving CALJIC No. 2.50.01 (which is identical to CALJIC 2.50.02

27  in all aspect except it addresses prior acts of sexual violence), which pertained to evidence of prior sexual offenses in tandem with CAJLIC No. 2.50.1, which explained that the prosecution had the burden of proving the prior offenses

28  by a preponderance of the evidence, allowed the jury to find the defendant guilty by relying on facts found only by a preponderance of the evidence.

1   (1993).

2   H.      Admission of Prior Acts of Domestic Violence

3           Petitioner contends that the trial court abused its discretion in failing to exclude evidence

4   of Petitioner's prior acts of domestic violence as too prejudicial, within the meaning of California

5   Evidence Code section 352.  To the extent this claim does not involve whether the state court

6   properly applied Evidence Code section 352, a purely state law issue, the claim is resolved by

7   Petitioner's claim that section 1109 violated his due process rights.

8           The admissibility of evidence is a matter of state law, and improper admission of

9   evidence does not usually violate the Constitution and is not normally cognizable in federal

10  habeas corpus.  See Estelle v. McGuire, 502 U.S. 62, 68, 112 S.Ct. 475, 480 (1991).

11  Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission

12  was fundamentally unfair and resulted in a denial of due process.  See Windham v. Merkle, 163

13  F.3d 1092, 1103 (9th Cir. 1998)

14          As Respondent submits, although prior propensity evidence has the potential to be

15  prejudicial, its relevance has been determined by the California Legislature.  In enacting the

16  statute, the Legislature concluded that evidence of prior acts of domestic violence is sufficiently

17  probative, despite the obvious prejudice to a defendant that is inherent in such evidence, to be

18  admissible in new prosecutions involving domestic violence.  People v. Soto, 64 Cal.App.4th

19  966, 984, 991 (1998) [discussing analogous §1108].

20          In rejecting Petitioner's claim on direct appeal, the Court of Appeal held:

21                  Here, the evidence presented was similar to the crimes charged.  Each
            situation involved arguments in which [Petitioner] insisted on having the final
22          word.  Each involved [Petitioner] exhibiting control over his partner through
            restraint or physical violence.  Each involved [Petitioner] "proving" he was
23          physically superior to his partner (striking, choking or restraining).
                    [Petitioner's] actions, which resulted in his conviction, were extensions of
24          this conduct.  He forced Lisa into the car, struck her when she ran from him and
            took her to the apartment where she was restrained.  He demonstrated his physical
25          superiority over her by choking her and forcing her to have intercourse with him.
            Each of his prior acts was consistent with a portion of the charged conduct.
26                  [Petitioner's] conduct mirrored the type of conduct described by the
            Legislature in adopting Evidence Code section 1109.  "The propensity inference is
27          particularly appropriate in the area of domestic violence because on-going
            violence and abuse is the norm in domestic violence cases.  Not only is there a
28          great likelihood that any one battering episode is part of a larger scheme of

                                                   34

dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. . . .' [Citations]."

[Petitioner's] defense that the intercourse was consensual created a credibility contest.  The prior domestic violence evidence was probative because it demonstrated a course of conduct consistent with the charged crimes, leading to an inference that Lisa's testimony was more credible.  The prior acts evidence consumed very little time at trial, and was less inflammatory than the testimony about the rape.  The prior acts were close in time (approximately one year) and Toni Cantu, Cheryl Ferguson and Lashanda provided independent corroboration of [Petitioner's] conduct.

The prejudice presented by this evidence is inherent in all propensity evidence and does not render the evidence inadmissible.  The fact that [Petitioner] was not convicted of any of the other offenses does not, in and of itself, render the evidence inadmissible.  Thus, the trial court did not abuse its discretion under Evidence Code section 352 by admitting testimony about the other incidents.

(Respondent's Exhibit D, at 12-13.)

For the reasons explained by the Court of Appeal and based on the lack of prejudice and relevance of the evidence, it cannot be said that the admission of the prior acts of domestic violence was fundamentally unfair resulting in a denial of due process.  The state courts' determination was not contrary to or, an unreasonable application of, clearly established Supreme Court precedent.

I.     Evidentiary Hearing

With respect to claims 1, 3, 4, 5, 6 and 7, Petitioner requests an evidentiary hearing.

Rule 8(a) provides that where a petition is not dismissed at a previous stage in the proceeding, the judge, after the answer and transcripts and record of the state court proceedings are filed, shall, *upon review* of those proceedings, determine whether an evidentiary hearing is required.  The purpose of an evidentiary hearing is to resolve the merits of a factual dispute.  An evidentiary hearing on a claim is required where it is clear from the petition that:  (1) the allegations, if established, would entitle the petitioner to relief;  and (2) the state court trier of fact has not reliably found the relevant facts.  See Hendricks v. Vasquez, 974 F.2d 1099, 1103 (9th Cir.1992).  As the function of an evidentiary hearing is to try issues of fact, Townsend v. Swain 372 U.S. 293, 309 (1963)(*overruled in part by* Keeney v. Tamayo-Reyes, 504 U.S. 1, 112 S.Ct. 1715 (1993)), such a hearing is unnecessary when only issues of law are raised. Id.

The standard for granting an evidentiary hearing is stated in 28 U.S.C. § 2254(e)(2):

1
2
3
4

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that . . . the claims relies on . . . a factual predicate that could not have been previously discovered through the exercise of due diligence and . . . the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

5   If the applicant has not failed to develop the facts in state court, the district court may

6   proceed to consider whether a hearing is appropriate, or required under <u>Towsend v. Sain</u>, 372

7   U.S. 293 (1963) (overruled on other grounds).  In <u>Towsend</u>, the Supreme Court concluded that a

8   defendant is entitled to a federal evidentiary hearing on his factual allegations if: "(1) the merits

9   of the factual dispute were not resolved in the state hearing; (2) the state factual determination is

10  not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the

11  state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation

12  of newly discovered evidence; (5) the material facts were not adequately developed at the state-

13  court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas

14  applicant a full and fair hearing." <u>Id</u>. at 313.

15  Even assuming Petitioner has avoided § 2254(e)(2), an evidentiary hearing is not required

16  because the issues can be resolved based on the record before it.  Petitioner has not demonstrated,

17  and this Court has not found, the need for an evidentiary hearing as the claims can be resolved

18  based upon a review of the state court record.  Further, as Respondent submits, Petitioner merely

19  requests an evidentiary hearing without identifying what additional evidence he intends to add to

20  the record and how he intends to present it, let alone how the information will influence the

21  outcome.  Accordingly, Petitioner's request for an evidentiary hearing is denied.

22                                        CONCLUSION

23  Based on the foregoing, it is HEREBY ORDERED that:

24  1.      The petition for writ of habeas corpus is DENIED; and

25  2.      The Clerk of Court is directed to enter judgment in favor of Respondent.

26  IT IS SO ORDERED.

27  **Dated:   September 12, 2005**              **/s/ Dennis L. Beck**
    3b142a                                  UNITED STATES MAGISTRATE JUDGE
28